UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HENRIETTA FTIKAS, individually and on behalf of all others similarly situated, | § § § § § | Civil Action No. 4:16-cv-01205 |
| Plaintiff, | § § | JURY TRIAL DEMAND |
| v. | § § | |
| COLUMBIA PIPELINE GROUP, INC., ROBERT C. SKAGGS, JR., SIGMUND L. CORNELIUS, MARTY R. KITTRELL, W. LEE NUTTER, DEBORAH S. PARKER, TERESA A. TAYLOR, and LESTER P. SILVERMAN, | § § § § § § § § | |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

Plaintiff Henrietta Ftikas ("Plaintiff"), by her attorneys, on behalf of herself and all others similarly situated, alleges the following upon information and belief, including the investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged on knowledge:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this stockholder class action on behalf of the public stockholders of Columbia Pipeline Group, Inc. ("CPG" or the "Company"), against CPG and CPG's Board of Directors (the "Board" or "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, arising out of TransCanada Corporation's ("TransCanada") proposed acquisition of CPG at a grossly inadequate price, by means of an unfair process, and without adequate information provided to CPG stockholders (the "Proposed Transaction").

2.      Headquartered in Houston, Texas, CPG provides regulated gas transportation and storage services. CPG owns approximately 15,000 miles of large capacity interstate gas pipeline which extend from New York to the Gulf of Mexico.  The Company offers services to local gas distribution companies and users of natural gas.  CPG was spun off from NiSource, Inc. ("NiSource") on July 1, 2015.  Stockholders of NiSource received CPG shares pro rata as a result of the spinoff.

3.      On March 18, 2016, the Company filed a Form 8-K with the Securities and Exchange Commission ("SEC") announcing that it had entered into a Definitive Merger Agreement, dated March 17, 2016 (the "Merger Agreement"), pursuant to which TransCanada will acquire CPG for the wholly inadequate consideration of $25.50 per share ("Merger Consideration") in cash.

4.      At the time of the announcement, the consideration to be received by CPG stockholders was valued at just $25.50 per share – a *20% discount* to the Company's 52-week high trading price of $30.76 per share on July 7, 2015.  Additionally, the Board of CPG has decided to sell the Company during an economic slowdown for companies who deal with the production, transportation, and sale of natural gas.  In fact, according to NASDAQ's End of day Commodity Futures Price Quotes for Natural Gas ("NYMEX"), the value of natural gas reached a five-year low in March of 2016, precisely when the Board decided to sell the Company:



(a)      Natural gas index for previous 6 months as of 4/15/2016.



(b)      Natural gas index for previous 5 years as of 4/15/2016.

5.      At this point – while the natural gas industry bottomed to a five-year low – the

Board decided to wash its hands of the Company entirely.  Thus, despite realizing that engaging

in a sales process at this inopportune time would place an artificially depressed ceiling on any

3

merger consideration received, the Board pushed forward with a sales process, ultimately resulting in the inadequate $25.50 per share.  Accordingly, the Individual Defendants have entered into the Merger Agreement with TransCanada at the most inopportune time, when the Company's trading price is artificially depressed while oil and gas prices recover worldwide, thus depriving Plaintiff and the public stockholders of the Company the opportunity to participate in the growth of the Company they have loyally invested in.  As a result, the Merger Consideration *significantly* undervalues CPG.

6.    Indeed, given the strength of the Company and its poise for future success, TransCanada will acquire CPG at a price that does not accurately reflect the inherent, standalone value of CPG.  The Company boasts increasing profitability each quarter and expanding organic growth.  Although only existing as a standalone corporation for less than a year, CPG was able to originate over $3 billion in new expansion projects.  As the Company disclosed in its 2015 Annual Reported filed on Form 10-K with the SEC on April 7, 2016, in "every key respect, 2015 was a landmark year for CPG."  Moreover, speaking on the 2015 fiscal year, Robert C. Skaggs, Jr. ("Skaggs"), Chief Executive Officer ("CEO") of CPG, stated:

> Columbia Pipeline Partners' IPO in February 2015 was an integral part of a landmark year at CPG.  The partnership delivered solid results, squarely in line with our expectations.  Despite the **dislocation of the financial markets, our outlook remains unchanged -- specifically, delivering 20 percent annual distribution growth through 2020**.

(Emphasis added).

7.    Exacerbating matters, under the terms of the Merger Agreement, Defendants have further tilted the playing field in favor of TransCanada with a slate of deal protection provisions that unreasonably deter third-party bidders from launching topping bids, including:  (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or

even in continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose confidential information about competing bids to TransCanada; and (iii) a prohibitively large termination fee of $309 million to be paid by CPG in the event it chooses to pursue an alternative, superior offer.

8.      These deal protection provisions, particularly when considered collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of CPG.

9.      Finally, in the Schedule 14A Preliminary Proxy Statement filed with the SEC on April 8, 2016 (the "14A"), Defendants failed to disclose all material information necessary for CPG stockholders to make an informed decision regarding the Proposed Transaction. Defendants have violated the above-referenced Sections of the Exchange Act by causing the materially incomplete and misleading 14A to be filed with the SEC.  The 14A recommends that CPG stockholders vote in favor of approving the Proposed Transaction following an unfair process, in exchange for the inadequate Merger Consideration, and without disclosing all material information concerning the Proposed Transaction to Company stockholders

10.      Specifically, the 14A misrepresents or fails to disclose, *inter alia*, the following: (1) the background of the Proposed Transaction; (2) CPG's financial projections, relied upon by Lazard Frères & Co. LLC ("Lazard") and Goldman Sachs & Co. ("Goldman"); and (3) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinions" provided by the Company's financial advisors, Lazard and Goldman.

11.      To remedy Defendants' Exchange Act violations, Plaintiff seeks injunctive relief preventing consummation of the Proposed Transaction unless and until the material information discussed below is disclosed to CPG stockholders or, in the event the Proposed Transaction is

consummated, to recover damages resulting from Defendants' violations of the Exchange Act. Without this information, Plaintiff and CPG stockholders will be prevented from intelligently and rationally deciding for themselves whether they approve of the merger or desire to seek appraisal.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     This Court has jurisdiction over Defendants named herein because each is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.   CPG is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual Defendants, and Company officers and/or directors, either reside in this District or have extensive contacts within this District

## PARTIES

15.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of CPG.

16.     CPG is a Delaware corporation with its headquarters in Houston Texas.  CPG's principal executive offices are located at 5151 San Felipe Street, Suite 2500, Houston, Texas,

77056.  CPG's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "CPGX."

17.     Defendant Skaggs is, and was at all relevant times, a director, Chairman of the Board, President, and CEO of CPG.  Previously, Mr. Skaggs served as a CEO and a Director of NiSource since 2005 and a President since 2004.

18.     Defendant Sigmund L. Cornelius ("Cornelius") is, and was at all relevant times, a director of CPG. Cornelius has been a director of the Company since 2015 and is currently the lead director.  Prior to the Company's spinoff from NiSource, Cornelius served as a director of NiSource since 2011.

19.     Defendant Marty R. Kitrrell ("Kitrrell") is, and was at all relevant times, a director of CPG.  Kitrrell has served as a director of the Company since 2015 and previously served as a director of NiSource since 2011.

20.     Defendant W. Lee Nutter ("Nutter") is, and was at all relevant times, a director of CPG.  Nutter has served as a director of the company since 2015 and previously served as a director of NiSource since 2007.

21.     Defendant Deborah S. Parker ("Parker") is, and was at all relevant times, a director of CPG.  Parker has served as a director of the Company since 2015 and previously served as a director of NiSource since 2007.

22.     Defendant Teresa A. Taylor ("Taylor") is, and was at all relevant times, a director of CPG.  Taylor has served as a director of the Company since 2015 and previously served as a director of NiSource since 2012.

23.     Defendant Lester P. Silverman ("Silverman") is, and was at all relevant times, a director of CPG.  Silverman has served as a director of the Company since 2015.

## FURTHER SUBSTANTIVE ALLEGATIONS

**_Company Background_**

24.     CPG is a Delaware corporation formed by NiSource on September 26, 2014, to operate a series of pipelines.  On July 1, 2015, NiSource executed a spinoff in which NiSource stockholders received one share of CPG for every NiSource share that they owned.  As of April 1, 2015, CPG is an independent, publicly traded company, whose shares trade on the New York Stock Exchange under the ticker symbol "CPGX."  CPG owns approximately 15,000 miles of strategically located interstate gas pipelines extending from New York to the Gulf of Mexico. The Company's pipelines have a large volume capacity.

25.     Although less than a year old, CPG has already demonstrated its financial health and performance as a standalone business.  On August 3, 2015, the Company announced its financial results for the second quarter of 2015.  The Company reported net income of $61.2 million as compared to $59.4 million for the prior year period.  These results were particularly important considering CPG had just recently completed its spinoff from NiSource.  Speaking on the Company's second quarter results and the anticipated success of CPG as a standalone company, Defendant Skaggs stated:

> A tremendous amount of hard work by the CPG and NiSource teams allowed us to successfully execute our separation strategy.  ***As a standalone pipeline, midstream and storage company, we believe CPG presents a compelling investment proposition*** -- a unique combination of very stable cash flows, a high quality and diverse customer base and highly visible growth driven by an unmatched position in the country's most prolific shale basins.

(Emphasis added).

26.     Also disclosed in these results was that in 2015 alone, CPG was planning on investing approximately $1.2 billion in growth projects.  Specifically, on June 24, 2015, the Board approved the Mountaineer Xpress ("MXP") and Gulf XPress ("GXP") projects.  These

significant investments will provide increased capacity for the CPG's Marcellus and Utica Shale production.   MXP alone will be able to provide up to 2.7 billion cubic feet per day of transportation capacity on the Columbia Gas Transmission system.   Notably, although the investments were made in 2015, these projects were not expected to be placed into service until 2018 – well after the consummation of the Proposed Transaction.

27.     On November 3, 2015, CPG announced its financial results for the third quarter of 2015.  The Company reported an income of $63.1 million, compared to $53.7 million for the third quarter of 2014.  This was the first quarter in which CPG operated entirely independently of NiSource.  Despite the recent decline in the natural gas industry, Defendant Skaggs stated that the "fundamentals of our business remain solid, and our growth profile continues to distinguish CPG.  The CPG Team delivered quarterly results squarely in line with our expectations, and we remain on track to meet our 2015 EBITDA target of approximately $680 million."

28.     Most recently, on February 18, 2016, the Company released its fourth-quarter and full-year results for 2015, reporting adjusted EBITDA for the 12-month period ended December 31, 2015, of $685.5 million, an increase of $84.5 million over 2014.  In addition, the Company disclosed that it was expecting to increase annual EBITDA and dividends by 20% and 15%, respectively, through the year 2020.   In commenting on CPG's monumental success following its spinoff from NiSource, Defendant Skaggs stated that:

> "[l]ast year was clearly an historic one for CPG -- we completed a seamless separation from NiSource, secured **the largest project in our company's history and continued our focus on the flawless execution of our deep inventory of expansion and modernization projects.   This is an exciting and, truly transformational, time for CPG.**

(Emphasis added).

29.     However, despite the financial strength of the Company and its recent large investments into its pipeline infrastructure, the Individual Defendants have entered into the Merger Agreement with TransCanada, depriving Plaintiff and the public stockholders of the Company the opportunity to participate in the growth of the Company in which they have loyally invested.

### *The Flawed Sales Process*

30.     As revealed by the 14A, the Merger Agreement is the result of an inherently flawed sales process, commandeered by the Board and by Stephen P. Smith, Chief Financial Officer of CPG ("Smith").  Throughout the sales process, CPG's Board dealt on an almost exclusive basis with TransCanada and refused to explore other strategic options by adopting multiple exclusivity agreements with TransCanada despite significant changes in the market.

31.     CPG spun off from NiSource and became an independent, publically traded company on July 1, 2015.  Interest in acquiring CPG began almost immediately when the CEO of a large U.S. midstream energy company which was referred to as "Party A" left a voicemail for Defendant Skaggs expressing interest in future opportunities for the two companies.

32.     On July 7, 2015, Defendant Skaggs returned the call to Party A's CEO and had a discussion about industry developments.  The 14A does not disclose whether Defendant Skaggs and Party A's CEO discussed the possibility of an acquisition.  Just a few weeks later, the CEO of another large U.S. diversified utility company, referred to as "Party B," called Defendant Skaggs to inquire about meeting to explore strategic opportunities.  On July 20, 2015, Defendant Skaggs met with the CEO of Party B, and Party B made a verbal indication of interest in acquiring CPG at a range of $32.50-$35.50 with half of the consideration to be paid in cash and half in Party B common stock.

33.     On August 3 and 4, 2015, the Board met with representatives of Lazard, Goldman, and  Sullivan & Cromwell LLP ("Sullivan & Cromwell") where they determined that based on significant growth projects, Party B's $32.50 to $35.50 mixed consideration offer was too low.  Notably, the Board determined that Party B's offer was too low after considering the financial analyses of Lazard and Goldman and considered the intrinsic value of EPG considering its long-term business strategy.   However, the Board authorized CPG to enter into a non-disclosure agreement with Party B and provide Party B with certain non-public information in order to facilitate a stronger proposal.  The 14A does not disclose whether this confidentiality agreement contained a standstill provision.  On August 5, 2015, Defendant Skaggs contacted Party B's CEO to convey that the Board felt that it required a price per share in the "upper-$30s."  The 14A does not disclose how the Board came to this evaluation.

34.     On August 12, 2015, CPG and Party B entered into a mutual non-disclosure agreement and provided Party B with limited due diligence and non-public information regarding CPG.  However, due to the volatile economic conditions, CPG's stock price declined and Party B indicated that it was no longer willing to acquire CPG in the previously indicated $32.40 to 35.50 price range.  On August 31, 2015, Party B agreed to terminate discussions regarding a potential transaction, and CPG asked party B to destroy any confidential information it had received pursuant to the non-disclosure agreement.  The 14A does not disclose what price range Party B was willing to negotiate.

35.     On October 9, 2015, CPG effectively entered into an agreement to deal exclusively with TransCanada when François Poirier, the Senior Vice-President of TransCanada ("Poirier"), called Smith requesting a dinner together.  The two officers had a "prior business relationship" which the 14A comments no further on.  Throughout the course of the process

leading up to the deal, the "prior business relationship" between Poirier and Smith was the driving force between CPG and TransCanada entering into a Merger Agreement.

36.     On October 19 and 20, 2015, the Board held a meeting in which members of the Board and management discussed the declining global market conditions and the difficulties faced by companies in the energy industry.  By then, CPG shares had fallen from $30.76 on July 7, 2015, to a closing price as low as $17.70 on September 29, 2015.  The Company needed access to equity in order to fund its ambitious growth plans.  Defendant Skaggs suggested that the Board engage in a dual-track strategy to plan and prepare for a near-term equity offering and engage in exploratory discussions with potential acquirers.  Smith mentioned that he had an upcoming dinner meeting with Poirier and thought that a possible transaction between CPG and TransCanada was possible.

37.     By October, 2015, CPG was becoming hard-pressed to find a solution for its equity shortage and began to push for a definitive agreement from potential suitors or else it would conduct a large equity offering.  On October 26, 2015, Smith and Poirier met for dinner. Poirier indicated that TransCanada wanted to acquire CPG.  On November 2, 2015, Defendant Skaggs met with Party B's CEO who indicated that Party B was interested in pursuing a joint acquisition of CPG with a large U.S. utility company ("Party C") in an all-stock transaction or an equity investment by Party B in CPG subsidiaries.  The 14A does not disclose with any specificity the details of these two potential strategic alternatives.

38.     On November 11, 2015, Goldman contacted a representative from a large, privately held energy company ("Party D") to seek an indication of interest in a private investment in public equity investment.  Party D expressed its interest in acquiring CPG.  By November 17, 2015, CPH had entered into mutual non-disclosure agreements with TransCanada,

Party B, Party C, and Party D.  The 14A does not disclose whether these mutual non-disclosure agreements contained standstill provisions, and if so, whether these standstill provisions terminated following the merger announcement.

39.     On November 17, 2015, the Board had a telephonic meeting where it renewed discussions about a potential equity offering.  Defendant Skaggs provided an update on the discussions with Party B, TransCanada, and Party D.  The Board decided that it needed to move forward with an equity offering because it may miss an "optimal window" if it were to be delayed passed early December.  The 14A neglects to provide any further information on why this time frame was being regarded as the "optimal window."

40.     On November 24, 2015, TransCanada made a verbal indication of an all-cash acquisition in the range of $25-$26.  On the same day, Party D indicated that it was interested in acquiring CPG for a price per share of $23.50 in cash.  The 14A does not reveal whether or not the Board sought an updated indication of interest from Party B either individually or jointly with Party C or whether it communicated to Party A the urgency of making a decision before the "optimal window" closes.  On November 25, 2015, Defendant Skaggs contacted the CEOs of TransCanada and Party D and indicated that the Board did not accept their indications of interest and would be moving forward with the planned equity offering.  TransCanada then indicated through a phone call made by Russell K. Girling, Chief Executive Officer of TransCanada ("Mr. Girling"), a "few days" later that it would be willing to increase its price.  However, in an effort to deal within this "optimal window," the Board continued to rush the process and Defendant Skaggs turned away TransCanada's potential offer.

41.     In December of 2015, CPG completed its equity financing transaction.

42.    In January of 2016, Poirier contacted Smith again to request a meeting.   On January 7, 2016, Poirier and Smith met, and Poirier indicated that he was still interested in acquiring CPG.   The 14A is silent on why CPG, having just completed its equity offering, decided to not reengage with Party A, Party B, Party C, or Party D following its equity offering and has now decided to reopen negotiations on an exclusive basis with TransCanada.   The sudden change in management is especially dubious considering it had just turned down a potentially increased offer from TransCanada in order to complete an equity financing transaction within the "optimal window."   Nevertheless, TransCanada contacted Defendant Skaggs through Mr. Girling on January 25, 2016, and indicated that it was interested in acquiring CPG for a price range of $25-$28 per share but demanded exclusivity.

43.    Just *three days later* and without contacting Party A, Party B, Party C, or Party D, the Board entered into an exclusivity agreement with TransCanada.   The Board indicated that it was fearful "of TransCanada terminating discussions with CPG."   The 14A does not disclose whether any members of the Board considered that the unnamed Parties may have been able to offer stronger consideration to the stockholders.   Additionally, the 14A does not mention whether TransCanada had threatened to revoke its interest indication or in the alternative why the Board was so fearful of TransCanada terminating its discussions with CPG.   In this way, the Board failed to perform an adequate investigation and acclimate themselves of all the material information that *should have* been made available regarding other potential acquirers before entering into an exclusivity agreement with TransCanada.

44.    On February 1, 2016, CPG and TransCanada entered into an exclusivity agreement pursuant to which TransCanada was granted the exclusive right to negotiate with CPG

regarding a potential acquisition.  Due to the Board's decision, CPG would be unable to solicit any potentially stronger indications of interest until March 2, 2016.

45.     Beginning on February 3, 2016, and continuing into March, CPG and TransCanada began negotiating the terms of the Merger Agreement.  The negotiation process was frustrated due to the fact that TransCanada was having difficulty gaining approval of its financing plan under the negotiated Merger Agreement.  On February 19, 2016, Poirier called Smith to inform him that TransCanada was having difficulty in having its financing plan approved while simultaneously maintaining its credit rating.  The 14A does not indicate what else was discussed over this phone call.  The phone call was strategically timed given TransCanada's difficulty in having its finance plan approved and considering that the exclusivity agreement was set to lapse less than two weeks later.

46.     On March 1 and 2, 2016, members of the management of CPG and TransCanada met to negotiate terms of the agreement.  Without discussing possible alternatives, the Board elected *to extend* the exclusivity agreement with TransCanada for another six days, through March 8, 2016.  Despite negotiations between the two companies' law firms, Smith and Poirier continued to broker this deal to ensure that CPG was acquired by TransCanada.  Poirier called Smith *again* to discuss the ability of TransCanada to maintain its current credit rating.

47.     After more negotiations, Poirier called Smith again on March 5, 2016, and offered a price of merely $24 per share.  Notably, this price was below the threshold of what the parties negotiated their exclusivity agreement on.  The 14A does not reveal whether CPG could be excused from the exclusivity contract given that TransCanada's indication of interest was below the range upon which the exclusivity contract was negotiated.  CPG rejected the bid because of its inadequacy, and the parties continued to negotiate on price.  Eventually, on March 6, 2016,

the Board communicated that it would be unwilling to sell CPG for a price less than $26 per share.  Particularly noteworthy is that this demand is more than $6 per share less than the offer that Party B made on July 20, 2015, which was ***rejected as being inadequate.***

48.     On March 8, 2016, the Board began laboring under the pressure of its mistakes when the delayed negotiations became publically scrutinized due to an information leak.  The senior management of CPG became aware that various investment banks, including Goldman, knew that *The Wall Street Journal* was preparing to release a story involving TransCanada acquiring a company.  To make things even more complicated, TransCanada was delaying further negotiations due to the general turmoil in energy markets and the difficulties that were specific to Canadian markets.  As reported in *The Globe and Mail* on March 1, 2016:

> Canada's oil-battered economy in 2015 grew at less than half the pace of 2014, Statistics Canada reported, as a return to sluggish growth in the fourth quarter punctuated a disappointing year.  Statscan said Tuesday that real (i.e. inflation-adjusted) gross domestic product rose just 1.2 per cent in the year, down from 2.5 per cent in 2014.  That's the slowest growth since the 2009 recession, as slumping prices for oil and other commodities took a big bite out of national income, business investment and domestic demand.

The 14A does not disclose whether the Board discussed any possible strategic alternatives given the substantial decline in the energy markets.

49.     Management from CPG continued to discuss the information leak and began to consider accepting a low offer from TransCanada.  On March 8, 2016, the exclusivity agreement expired for a second time.  Then, on March 9, 2016, a representative from Goldman informed the CPG management that *The Wall Street Journal* was in preparation to report that TransCanada was in advanced negotiations to acquire CPG.

50.     On March 9, 2016, Poirier and Smith continued their private brokering of this deal when they talked over the phone, and Poirier outlined an indicative offer for TransCanada to

acquire CPG at $26 per share.  At this point in the negotiations, the exclusivity agreement had expired.  The market for natural gas was at *its lowest* point in the last five years according to NASDAQ's End of day Commodity Futures Price Quotes for Natural Gas.  Most energy corporations, and specifically Canadian companies, were experiencing over a year of economic downturn, and the Board was under intense pressure due to a leak in the details of the negotiation.  Instead of convening the Board to consider possible strategic alternatives, including delaying negotiations to consider this extended period of economic slowdown, the Board continued to exclusively deal with TransCanada *despite* an expired exclusivity agreement.

51.    On March 10, 2016, *The Wall Street Journal* published an article reporting that TransCanada was in advanced negotiations to acquire CPG.  As a direct result of the leak, the NYSE halted the trading of CPG stock, and the Toronto Stock Exchange halted the trading of TransCanada common stock until TransCanada addressed the rumor.

52.    Also, on March 10, 2016, the Board held a meeting where it discussed the latest offer made by Poirier to Smith.  TransCanada's latest offer involved $23.40 in cash plus stock in TransCanada which effectively amounted to $2.60 per share for each CPG stock.  On March 11, 2016, Poirier and Smith spoke again.  Poirier requested yet another exclusivity agreement to protect the deal that the two were independently brokering.

53.    On March 11, 2016, Defendant Skaggs received an e-mail from the Chief Executive Officer of Party A.  As it turns out, Party A was still interested in offering competing bids for CPG.  Although the Board and TransCanada tried to broker an exclusive deal from the start, the information leak foiled their plans.  Party A learned that CPG was still interested in being acquired through an ***information leak reported*** in *The Wall Street Journal* article rather than from the Board.

54.     On March 11, 2016, the Board met to consider the information leak, Party A's communications, and the discussion with TransCanada.  Before even seriously discussing Party A's offer, the Board began discussing entering into **another** exclusivity agreement with TransCanada subject to an "evaluation" of Party A's inquiry.   The "evaluation" of Party A's indication involved discussing whether the indication "would likely distract management and CPG's advisors from pursuing the proposal that had been made by TransCanada."  Without any serious negotiations, the Board decided to not conduct any serious negotiations with Party A nor discuss any potential alternative strategic routes.  The Board entered into yet another exclusivity agreement with TransCanada to continue through March 18, 2016.   Under this exclusivity agreement, the Board was only able to respond to **unsolicited** acquisition proposals.

55.     On March 14, 2016, management from both companies discussed TransCanada's recent subscription receipts offering and the serious deterioration of TransCanada's stock price following the leak.   At this meeting, TransCanada indicated that the previous mixed-consideration offer would not be maintained and offered to acquire CPG at $25.50 in cash per share.  TransCanada then pressured the Board by telling them if there was not an acceptance in the next few days, then TransCanada would terminate all discussion.

56.     Later, on March 14, 2016, the Board met and discussed TransCanada's most recent offer.  The Board was expecting a written proposal from Party A in the next few days but decided to forgo consideration of Party A's proposal in exchange for a reduced termination fee of 3% of the equity value of the transaction.

57.     On March 16, 2016, the Board met again to discuss TransCanada's offer.  A presentation made by a representative of Lazard indicated that Party A may be able to acquire CPG for a mixed-consideration ranging from $25.50 to $28 per share of CPG stock.  Instead of

waiting to learn the details of Party A's impending written proposal, the Board concluded that it would lose TransCanada's offer of $25.50 if they waited any longer. The Board had made its decision in what had been an unfairly one-sided and nearly exclusive deal from the start to enter into a Merger Agreement with TransCanada for an all cash deal of $25.50 per share. The Individual Defendants unanimously approved the merger.

58.     On March 17, 2016, the board of TransCanada and the Board of CPG executed the Merger Agreement.

### *The Proposed Transaction*

59.     Despite CPG's historic 2015, its seamless separation from NiSource less than nine months earlier, its securing the largest project in the Company's history, and its flawless execution of its deep inventory of expansion and modernization projects, the Board decided to sell the Company rather than pursue its excellent prospects as a standalone business. In a press release dated March 17, 2016, CPG announced the Proposed Transaction, in pertinent part, as follows:

> **HOUSTON** – Columbia Pipeline Group, Inc. ("CPG") (NYSE: CPGX) today announced that it has entered into a definitive agreement to be acquired by TransCanada Corporation ("TransCanada") (TSX, NYSE: TRP) for $25.50 per share in cash. Including the assumption of CPG debt, the total enterprise value of the transaction is approximately $13 billion. The agreement, which has been unanimously approved by CPG's Board of Directors, represents a premium of approximately 32% to the volume weighted average price over the last 30 days.
>
> "This transaction delivers tremendous value to our shareholders and places CPG within a leading energy platform that can maximize the value of our strategic positioning and deep inventory of transformational growth projects," said CPG Chairman and Chief Executive Officer Robert C. Skaggs, Jr. "The value presented here is a strong endorsement of our team's outstanding work. I am confident that this newly enhanced business will continue to deliver on our core commitments to customers, employees, stakeholders and stockholders."
>
> "This transaction is truly transformational for TransCanada," said Russ Girling, President and CEO of TransCanada. "CPG's interstate pipeline and midstream

assets sit directly on top of the fastest growing areas of the Marcellus and Utica Shale regions.  This provides us with a complementary asset base, a substantial growth pipeline network and a broad team that has a solid track record of executing on projects and delivering results."

**Transaction Details**

The transaction is expected to close in the second half of 2016, subject to customary closing conditions, including receipt of regulatory approvals.  The transaction requires the affirmative vote of holders of a majority of CPG's outstanding shares.

TransCanada has senior unsecured bridge credit facilities in place for up to US $10.3 billion with a syndicate of lenders.

Following completion of the transaction, TransCanada will own the general partner of Columbia Pipeline Partners LP (NYSE: CPPL) ("CPPL"), all of CPPL's incentive distribution rights and all of CPPL's subordinated units, which represent a 46.5% limited partnership interest in CPPL.  Upon closing of the transaction, CPPL will remain a publicly traded partnership.  Additional detail on the transaction can be found on the TransCanada website at www. transcanada.com.

Goldman, Sachs & Co. and Lazard acted as financial advisors to CPG. Sullivan & Cromwell LLP and Bennett Jones LLP acted as legal counsel to CPG.

***

### <u>Conflicts of Interest</u>

60.    In light of the facially inadequate Merger Consideration, it should come as little surprise that the Proposed Transaction is also the result of an irremediably conflicted process. Specifically, certain members of the Board and executive management will receive lucrative payments and other benefits in connection with the consummation of the Proposed Transaction that common stockholders will not.   Moreover, the Proposed Transaction is the result of a skewed process designed to ensure the sale of CPG to one buyer, and one buyer only – TransCanada.

61.    First, many of the Individual Defendants hold otherwise illiquid blocks of CPG stock that will become liquid through the Proposed Transaction.   Upon completion of the

Proposed Transaction, certain outstanding stock-based awards will become subject to accelerated vesting, offering a substantial financial gain to certain officers and directors of the Company. Specifically, certain officers and directors will benefiting from the vesting of the following stock rewards:

(a)     outstanding time-based restricted stock units that will fully vest and will be cancelled and converted into the right to receive a cash amount equal to $25.50 in respect of each share of our common stock underlying such unit.  In 2015 NiSource granted the following time-based restricted stock units:

| | Number of NiSource Restricted Stock Units Awarded |
|---|---|
| Robert C. Skaggs, Jr. | 85,852 |
| Stephen P. Smith | 34,341 |
| Glen L. Kettering | 18,315 |
| Stanley G. Chapman, III | 9,158 |
| Shawn L. Patterson | 9,158 |

(b)     outstanding performance shares that will fully vest and be canceled with the right to receive a cash amount equal to $25.50 in respect of each share of CPG's common stock underlying each unit.

(i)     Granted for 2013

| Named Executive Officer | Pre-Separation NiSource Units | Performance Factor | Conversion Factor | Post-Separation CPG Time-Based Restricted Stock Units |
|---|---|---|---|---|
| Robert C. Skaggs, Jr. | 113,208 | 1.88 | 1.568 | 333,719 |
| Stephen P. Smith | 47,170 | 1.88 | 1.568 | 139,050 |
| Glen L. Kettering | 18,868 | 1.88 | 1.568 | 55,620 |
| Stanley G. Chapman, III | 10,377 | 1.88 | 1.568 | 30,590 |
| Shawn L. Patterson | 7,547 | 1.88 | 1.568 | 22,247 |

(ii)     Granted for 2014

| Named Executive Officer | Pre-Separation NiSource Units | Performance Factor(1) | Conversion Factor | Post-Separation CPG Time-Based Restricted Stock Units |
|---|---|---|---|---|
| Robert C. Skaggs, Jr. | 109,457 | 1.70 | 1.568 | 231,699 |
| Stephen P. Smith | 39,405 | 1.70 | 1.568 | 83,413 |
| Glen L. Kettering | 14,594 | 1.70 | 1.568 | 30,893 |
| Stanley G. Chapman, III | 11,675 | 1.70 | 1.568 | 24,714 |
| Shawn L. Patterson | 6,567 | 1.70 | 1.568 | 13,901 |

(iii)     Granted for 2015

| Named Executive Officer | Pre-Separation NiSource Time-Based Restricted Stock Units | Conversion Factor | Post-Separation CPG Time-Based Restricted Stock Units |
|---|---|---|---|
| Robert C. Skaggs, Jr. | 85,852 | 1.568 | 134,616 |
| Stephen P. Smith | 34,341 | 1.568 | 53,847 |
| Glen L. Kettering | 18,315 | 1.568 | 28,718 |
| Stanley G. Chapman, III | 9,158 | 1.568 | 14,360 |
| Shawn L. Patterson | 9,158 | 1.568 | 14,360 |

(c)     special one-time awards of time-based stock in 2013 and 2014 as follows:

| Named Executive Officer | Pre-Separation NiSource Time-Based Restricted Stock Units | Conversion Factor | Post-Separation CPG Time-Based Restricted Stock Units |
|---|---|---|---|
| Glen L. Kettering (*January 2014 Grant*) | 14,594 | 1.568 | 22,883 |
| Stanley G. Chapman, III (*May 2013 Grant*) | 17,188 | 1.568 | 26,951 |
| Stanley G. Chapman, III (*March 2014 Grant*) | 30,000 | 1.568 | 47,040 |
| Shawn L. Patterson (*August 2014 Grant*) | 40,128 | 1.568 | 62,921 |

(d)      outstanding phantom stock units that will fully vest and be cancelled and converted into the right to receive a cash amount equal to $25.50.  Specifically, Defendants Skaggs and Kettering both have 264,777 and 69,373 phantom units, respectively.

62.    Second, the Proposed Transaction is also a substantial boon to the Company's largest stockholder, JP Morgan.  Together, the members of the Board and Company management own over 3.3 million CPG shares, and JP Morgan controls over 43.6 million CPG shares (11.2% of the Company's outstanding shares).  The Board, Company management, and JP Morgan seek liquidity or other special benefits for their illiquid holdings.  The Proposed Transaction offers that liquidity, and if it closes, members of the Board and Company management will receive almost *$85 million* in cash, and JP Morgan will receive over *$1.1 billion* from the sale of their illiquid CPG holdings.  To ensure that it will receive that payday, JP Morgan is working with TransCanada to find buyers for more than $7 billion in assets to help TransCanada finance its acquisition of CPG.

63.    And, indeed, as disclosed in the Merger Agreement itself, JP Morgan is listed as one of the commitment parties who have provided the Debt Financing for the purposes of funding a portion of the consideration under the Merger Agreement.  JP Morgan stands to benefit substantially by being able to gain a control premium on the shares it controls and has provided a portion of the Debt Financing to ensure it benefits financially.

64.    Finally, as further detailed *supra*, Smith and Poirier effectively privately brokered this Proposed Transaction through their undisclosed "prior business relationship."

### *Preclusive Deal Protection Devices*

65.    The Proposed Transaction is also unfair because, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that

operate conjunctively to make the Proposed Transaction *a fait accompli* and ensure that no competing offers will emerge for the Company.

66. The Merger Agreement contains a No-Solicitation clause in which the Company must immediately cease and terminate any existing solicitation. In fact, Section 4.02(f) of the Merger Agreement forces the Company to cease any communications already occurring, stating:

> The Company agrees that it will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal. The Company agrees that it will take the necessary steps to promptly inform the Persons referred to in the first sentence of this Section 4.02(f) of the obligations undertaken in this Section 4.02 and in the Confidentiality Agreement. The Company also agrees that it will promptly request of each Person that has heretofore executed a confidentiality agreement in connection with its consideration of acquiring the Company or any of its Subsidiaries to return or destroy all confidential information heretofore furnished to such Person by or on behalf of it or any of its Subsidiaries.

67. Section 6.02(a) further expressly prohibits the Company from soliciting any Acquisition Proposals, stating:

> The Company agrees that, except as permitted by this Section 4.02, neither it nor any of its Subsidiaries nor any of the officers and directors of it or its Subsidiaries shall, and it shall instruct and use its reasonable best efforts to cause its and its Subsidiaries' employees, investment bankers, attorneys, accountants and other advisors or representatives (such officers, directors, employees, investment bankers, attorneys, accountants and other advisors or representatives, collectively, "Representatives") not to, directly or indirectly:
>
> (i) initiate, solicit or encourage any, or the making of any, inquiry, indication of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal;
>
> (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any information or data to any Person relating to, any inquiry, indication of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal; or
>
> (iii) otherwise knowingly facilitate any effort or attempt to make any inquiry, indication of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal.

68.     Furthermore, Section 4.02(g) grants TransCanada recurring and unlimited information rights, which gives CPG one (1) business day to provide unfettered access to confidential, non-public information about competing proposals from third parties and allows TransCanada four (4) business days to provide an offer that merely matches any competing superior offer.

69.     Compounding matters, Section 7.02(b)(iii) of the Merger Agreement requires the Company to pay a termination fee to TransCanada in the event the Company decides to pursue any alternative offer.  By the terms of the Merger Agreement, this termination fee will be payable to TransCanada in the amount of $309 million.  As such, this termination fee would require any competing bidder to agree to pay a naked premium simply for the right to provide CPG's stockholders a superior offer.

70.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The narrow circumstances under which the Board may respond to alternative proposals and the Company's inability to terminate the Merger Agreement, if it accepts a superior proposal, fail to provide an effective "fiduciary out" under the Merger Agreement.

### *The Materially Misleading Proxy Statement*

71.     Finally, it is critical that stockholders receive complete and accurate information about the Proposed Transaction prior to deciding whether to tender their shares.  Indeed, the Individual Defendants have a duty under Sections 14(a) and 20(a) of the Exchange Act to disclose all material information regarding the Proposed Transaction to CPG's stockholders so

that they can make a fully informed decision whether to vote in favor of the Proposed Transaction or seek to exercise their appraisal rights.

72.    Nonetheless, the 14A misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act.  As set forth in more detail below, the 14A omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Transaction; (2) CPG's financial projections, relied upon by Lazard and Goldman; and (3) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinions" provided by Lazard and Goldman.

**1.    The 14A Fails to Adequately Describe the Process that Resulted in the Proposed Transaction and the Conflicts of Interest Infecting It.**

73.    The 14A fails to fully and fairly disclose certain material information concerning the process leading to the Proposed Transaction and the conflicts of interest that infected it, including, among other things:

(a)    Details on the preexisting relationship between Smith and Poirier.

(b)    How the Board came to believe on August 5, 2015, that CPG's shares were worth a value in the "upper $30s."

(c)    What price range Party B was still willing to negotiate in for a potential transaction on August 31, 2015.

(d)    Any information whatsoever regarding Smith and Poirier's "prior business relationship" and how this relationship factored into the negotiation process.

(e)    Whether the non-disclosure agreements entered into with TransCanada, Party A, Party B, Party C, and Party D contained standstill provisions, and

if they did, whether these standstill provisions terminated following the merger announcement.

(f)     The rationale behind executing an equity offering in the "optimal window" and how CPG calculated the period of time that constituted this optimal window.

(g)     Whether, upon receiving initial indications from both TransCanada and Party D on November 24, 2015, the Board sought an updated indication of interest from Party B either individually or jointly with Party C.

(h)     If the Board had communicated with Party A on November 24, 2015, that its "optimal window" to perpetuate a merger or execute an equity offering was rapidly closing.

(i)     Why the Board failed to contact Party A, Party B, Party C, or Party D after completing its equity offering and continuing negotiations with TransCanada.

(j)     Whether, on March 2, 2016, the Board considered any strategic alternatives before extending the exclusivity agreement with TransCanada for another six days.

(k)     The terms of the initial exclusivity agreement (as extended by agreement on March 2, 2016); specifically whether Poirier's low offer of $24 per share constituted a breach to excuse CPG from the agreement.

74.     The 14A is false and/or misleading due to the omissions identified in ¶ 73 because it does not give stockholders material information that will allow them to fairly assess the process undertaken by the Board leading up to the Proposed Transaction.

## 2.     The 14A Fails to Adequately Disclose Management's Financial Projections.

75.     The 14A fails to disclose the financial projections for CPG provided by Company management and relied upon by Lazard and Goldman for the purposes of their analyses.

76.     Specifically, the 14A does not disclose the figures and assumptions regarding the debt and equity issuances, including the bases for the assumptions; the commodity price assumptions underlying the projections; or the figures related to transactions deemed "unusual, infrequent or not representative of underlying trends."

77.     In addition, the 14A fails to disclose the following line-items:

     (a)     Unlevered free cash flows;
     (b)     Reconciliation of GAAP net income to non-GAAP UFCF;
     (c)     Stock-based compensation;
     (d)     "Tax shield" cash flows; and
     (e)     All projected figures for stub period consisting of the second half of 2016.

78.     The omission of this information renders the following statements in the 14A false and/or materially misleading in contravention of the Exchange Act, from pages 69-70 of the 14A:

In developing the CPG financial forecasts, management of CPG made numerous material assumptions with respect to CPG for the periods covered by such forecasts, including:

- the EBITDA and maintenance capital expenditures from existing assets and business activities;

- organic growth opportunities and the amounts and timing of related capital expenditures and EBITDA;

- outstanding debt and new debt and equity issuances during applicable periods, and the availability and cost of debt and equity capital for CPG;

- the prices and production of crude oil, natural gas, natural gas liquids and other hydrocarbons, which could impact mineral interest royalties and EBITDA;

- the timing and pricing of debt and equity issuances by CPPL and the use of proceeds from such debt and equity issuances;

- CPG's tax profile; and

- other general business, market and financial assumptions.

The following is a summary of the CPG financial forecasts prepared by CPG's management and given to the Board, Goldman Sachs, Lazard and TransCanada:

**Fiscal Year Ending December 31,**

|  | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|
|  | ($ in millions, except per share data) | | | | | |
| Adjusted EBITDA (Consolidated) (1) | $712 | $800 | $1,101 | $1,650 | $1,763 | $1,900 |
| Distributable Cash Flow | $381 | $451 | $589 | $959 | $970 | $1,030 |
| Dividend Coverage | 1.7x | 1.8x | 2.0x | 2.9x | 2.5x | 2.3x |
| Dividend Per Share | $0.55 | $0.63 | $0.72 | $0.83 | $0.95 | $1.10 |
| Cash From (Used in) Investing Activities (2) | ($1,481) | ($2,861) | ($3,079) | ($1,072) | ($1,054) | ($913) |

|  | Fiscal Year Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
|  | ($ in millions) | | | | | |
| Net Income (Consolidated) | $263 | $465 | $623 | $807 | $861 | $921 |
| Interest Expense | 114 | 97 | 153 | 269 | 306 | 320 |
| Income Taxes | 119 | 158 | 194 | 301 | 329 | 369 |
| Depreciation, Depletion & Amortization | 167 | 182 | 228 | 287 | 301 | 319 |
| One-Time Adjustments (Separation from NiSource) | 87 | — | — | — | — | — |
| Other Adjustments, Net | (35) | (98) | (94) | (10) | (31) | (24) |
| Equity Investee's Distributions | 58 | 62 | 67 | 81 | 82 | 84 |
| Equity Earnings | (61) | (66) | (70) | (84) | (86) | (88) |
| Adjusted EBITDA (Consolidated) (1) | $712 | $800 | $1,101 | $1,650 | $1,763 | $1,900 |

79.     These statements in the 14A are rendered false and/or misleading by the omissions identified in ¶¶ 76-77 as this information is integral to stockholders' evaluation of the consideration being offered in the Proposed Transaction.  These financial projections provide a sneak peek into CPG's expected future performance (i.e., growth/profitability) and, consequently, its value as a standalone entity.  More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders, as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the most highly sought-after disclosures by stockholders in the context of corporate transactions such as this.

### 3.     The 14A Fails to Adequately Disclose the Data and Inputs Underlying Lazard's Valuation Exercises.

80.     The 14A fails to disclose the data and inputs underlying Lazard's valuation exercises that purportedly support their so-called "fairness opinions."  As an initial matter, the 14A should provide a valuation summary detailing the calculation of fully diluted shares, equity

value (at the unaffected price and the offer) and enterprise value (at the unaffected price and the offer).

81.   With respect to Lazard's Selected Companies Analysis, the 14A should disclose: (i) the observed company-by-company pricing multiples and financial metrics examined; (ii) a definition or explanation of the terms "near term" valuation range and "run rate" valuation range; (iii) an explanation of the apparent discrepancy between the use of EBITDA for the selected companies, whereas adjusted EBITDA was used for CPG; (iv) all assumptions (and the quantification and basis for each such) underlying estimated cost of equity; (v) an explanation of the manner in which the "near term" and "run rate" results were averaged; and (vi) all assumptions (and the quantification and basis for each such) underlying Lazard's estimate of the cost of equity used for the GP interest and IDRs.

82.   The omission of this information renders the following statements in the 14A false and/or materially misleading in contravention of the Exchange Act, from pages 63-65 of the 14A:

*Selected Comparable Company Multiples Analysis*

Lazard reviewed and analyzed certain financial information, valuation multiples and market trading data related to selected comparable publicly traded midstream companies whose operations Lazard believed, based on its experience with companies in the energy industry and its professional judgment, to be generally relevant in analyzing CPG's operations for purposes of this analysis. Lazard compared such information of the selected comparable companies to the corresponding information for CPG.

The selected group of companies used in this analysis with respect to CPG, which we refer to as the CPG comparable companies, was as follows:

- Enbridge Inc.;

- Kinder Morgan Inc.;

- ONEOK, Inc.;
- Spectra Energy Corporation; and

- TransCanada Corporation.

Lazard selected the companies reviewed in this analysis because, among other things, the CPG comparable companies operate businesses similar to the business of CPG. However, no selected company is identical to CPG. Accordingly, Lazard believes that purely quantitative analyses are not, in isolation, determinative in the context of the merger and that qualitative judgments concerning differences between the business, financial and operating characteristics and prospects of CPG and the CPG comparable companies that could affect the public trading values of each company are also relevant.

Lazard calculated and compared various financial multiples and ratios of each of the comparable companies, including, among other things:

- the ratio of each company's March 14, 2016 closing share price to its calendar year 2016 and 2017 estimated distributable cash flow per share, which ratio we refer to as the DCF multiple; and

- the ratio of each company's EV, which Lazard calculated, on a fully consolidated basis, as the market capitalization of each company (based on each company's closing share price as of March 14, 2016 and fully diluted share count as stated in such company's Form 10-K dated December 31, 2015), plus debt, noncontrolling interest and preferred or preference stock and less cash, cash equivalents and marketable securities as of December 31, 2015, to its estimated calendar year 2016 and 2017 EBITDA, which ratio we refer to as the EBITDA multiple.

The distributable cash flow and EBITDA estimates for the CPG comparable companies used by Lazard in its analysis were based on Wall Street research, which represents publicly available estimates. The following table summarizes the ranges of DCF multiples and EBITDA multiples for the CPG comparable companies utilizing distributable cash flow and EBITDA estimates for calendar years 2016 and 2017:

| | CPG Comparable Companies Range of Multiples |
|---|---|
| 2016E DCF Multiple | 8.7x – 15.0x |
| 2017E DCF Multiple | 8.1x – 13.3x |
| 2016E EBITDA Multiple | 11.4x – 14.4x |
| 2017E EBITDA Multiple | 10.7x – 13.2x |

For comparability, Lazard utilized CPG's estimated distributable cash flow per share, which Lazard calculated by dividing the estimated distributable cash flow as provided in the CPG financial forecasts by the number of fully diluted outstanding shares of CPG common stock as provided by CPG management, and CPG's estimated Adjusted EBITDA as provided in the CPG financial forecasts and described in the section entitled "—Certain CPG Forecasts" beginning on page [—] of this proxy statement. Based on Lazard's analysis of the DCF multiples and EBITDA multiples for the CPG comparable companies, as well as its professional judgment and experience, in order to derive consolidated "near term" valuation ranges for CPG, Lazard applied certain ranges of multiples to the estimates of CPG's consolidated distributable cash flow per share and Adjusted EBITDA for fiscal years 2016 and 2017, in each case based on the CPG financial forecasts, as described below:

- a range of DCF multiples of 11.5x to 13.5x was applied to CPG's estimated distributable cash flow per share of $0.95 for fiscal year 2016 and a range of DCF multiples of 10.25x to 12.25x was applied to CPG's estimated distributable cash flow per share of $1.12 for fiscal year 2017; and

- a range of EBITDA multiples of 11.0x to 12.5x was applied to CPG's estimated Adjusted EBITDA of $712 million for fiscal year 2016 and a range of EBITDA multiples of 10.5x to 12.0x was applied to CPG's estimated Adjusted EBITDA of $800 million for 2017.

In order to derive consolidated "run rate" valuation ranges for CPG based on CPG's estimated future equity value at the end of fiscal year 2019, Lazard applied, utilizing the CPG financial forecasts:

- a range of DCF multiples of 11.5x to 13.5x to CPG's estimated distributable cash flow per share of $2.40 for fiscal year 2020 and a range of DCF multiples of 10.25x to 12.25x to CPG's estimated distributable cash flow per share of $2.55 for fiscal year 2021; and

- a range of EBITDA multiples of 11.0x to 12.5x to CPG's estimated Adjusted EBITDA of $1,763 million

for fiscal year 2020 and a range of EBITDA multiples of 10.5x to 12.0x to CPG's estimated Adjusted EBITDA of $1,900 million for fiscal year 2021).

The estimated equity value at the end of fiscal year 2019 was discounted using an equity discount rate of 10.25%, derived with reference to the CPG comparable companies' cost of equity.

Lazard averaged the results of each of the consolidated near-term and consolidated run-rate calculations and, from each of these analyses, estimated an implied price per share range for shares of CPG common stock.

In addition, Lazard applied comparable company multiples to perform a sum-of-the-parts analysis of CPG. A sum-of-the-parts valuation analysis reviews a company on a segment-by-segment basis to determine an implied market value for the enterprise as a whole. Lazard based its analysis on the estimated respective values of (i) CPG's interest in CPG OpCo LP, a Delaware limited partnership and subsidiary of CPPL, which we refer to as CPG OpCo, (ii) CPG's general partner interest and incentive distribution rights in CPPL and (iii) CPG's limited partner units in CPPL.

- With respect to CPG's interest in CPG OpCo, Lazard applied the fiscal year 2016 DCF multiple range described above for the CPG comparable companies (11.5x to 13.5x) to CPG OpCo's estimated distributable cash flow for fiscal year 2021 (as reflected in the CPG financial forecasts), and discounted the resulting products using an equity discount rate of 10.25% derived with reference to the CPG comparable companies' cost of equity.

- With respect to CPG's general partner interest and incentive distribution rights in CPPL, Lazard derived a range of estimated distribution yields for fiscal year 2016 with reference to a group of publicly traded companies whose operations Lazard believed, based on its experience with companies in the energy industry and professional judgment, to be generally relevant in analyzing such general partner interest and incentive distribution rights, which we refer to as the GP comparable companies. The GP comparable companies consisted of Western Gas Equity Partners, EQT GP Holdings and Tallgrass Energy GP. A range of 4.0% to 5.0%, based on the estimated distribution yields for calendar year 2016 of the GP comparable companies, was applied to the estimated distributions in respect of CPG's general partner interest and incentive distribution rights in CPPL for fiscal year 2021 (as reflected in the CPG financial forecasts). This amount was then discounted using an equity discount rate of 14.5%, derived with reference to the GP comparable companies' cost of equity.

- With respect to CPG's limited partner units in CPPL, Lazard referred to the closing trading price of CPPL common units on the undisturbed date, which was $18.15, and multiplied that value by the number of limited partner units owned by CPG.

Lazard totaled the results of these analyses to estimate an implied price per share range for shares of CPG common stock.

The above analyses each resulted in an implied price per share range for shares of CPG common stock, as compared to the per share merger consideration, as set forth below:

| Implied CPG Price Per Share Range – Consolidated (Near Term) | Implied CPG Price Per Share Range – Consolidated (Run-Rate) | Implied CPG Price Per Share Range – Sum-of-the-Parts | Per Share Merger Consideration |
|---|---|---|---|
| $12.25 – $14.75 | $18.00 – $22.00 | $19.50 – $22.75 | $25.50 |

83.    These statements in the 14A are rendered false and/or misleading by the omissions identified in ¶ 81 because such omissions are essential to stockholders' ability to properly evaluate the analysis performed by Lazard.  Indeed, the selected comparable companies

used in the analysis were chosen because Lazard felt that they all shared similarities to CPG. Invariably, however, some types of companies will share more similarities to CPG than others, so information relating to Lazard's perspectives on relative comparability is vital when evaluating the multiples implied by Lazard's forecasts, compared to the multiples from the companies Lazard selected as part of this analysis.  Without the aforementioned information, stockholders' ability to understand Lazard's analysis is significantly limited, rendering them unable to make a fully informed decision whether to vote to approve the Proposed Transaction.

84.     With respect to Lazard's Discounted Cash Flow Analysis, the 14A should disclose: (i) the definition/formula for unlevered free cash flows; (ii) all assumptions (and the quantification and basis for each such) underlying WACC; (iii) the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples; (iv) all assumptions underlying the discount rates used for CPG's GP interest and IDRs and whether the discount rates are based on WACC or cost of equity; and (v) the manner in which the Lazard "averaged the price per share ranges implied by these calculations."

85.     The omission of this information renders the following statements in the 14A false and/or materially misleading in contravention of the Exchange Act, from page 66 of the 14A:

> *Discounted Cash Flow Analysis*
>
> Lazard performed a discounted cash flow analysis of CPG on a consolidated and sum-of-the-parts basis. A discounted cash flow analysis is a valuation methodology used to derive a valuation of a company by calculating the present value of its estimated future cash flows. "Future cash flows" refers to projected unlevered free cash flows of a company. "Present value" refers to the current value of future cash flows or amounts and is obtained by discounting those future cash flows or amounts by a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, capital structure, income taxes, expected returns and other appropriate factors. Lazard calculated the discounted cash flow value for CPG as the sum of the net present value, as of December 31, 2015, which we refer to as the discount date, of each of:
>
> •  the estimated future cash flows that CPG will generate for each of fiscal years 2016 through 2021; and
>
> •  the estimated value of CPG at the end of fiscal year 2021, or the terminal value.

The estimated future cash flow for CPG was calculated by Lazard based on the CPG financial forecasts. For its discounted cash flow calculations, Lazard applied discount rates ranging from 7.5% to 8.0% for both the consolidated analysis and the sum-of-the-parts analysis (with respect to CPG's interest in CPG OpCo). Such discount rates were based on Lazard's estimated range of CPG's weighted average cost of capital, derived from a number of factors, including, among others, the applicable risk free rate of return, unlevered risk profile, after-tax cost of long-term debt and consolidated leverage ratio of CPG and the CPG comparable companies.

The terminal value of CPG for the consolidated analysis was calculated by applying terminal year DCF multiples ranging from 11.5x to 13.5x to CPG's estimated terminal year distributable cash flow and applying terminal year EBITDA multiples ranging from 11.0x to 12.5x to CPG's estimated terminal year Adjusted EBITDA. The range of terminal year DCF multiples for CPG was selected by Lazard by reference to the estimated DCF multiples for the CPG comparable companies for calendar year 2016. The range of terminal year EBITDA multiples for CPG was selected by Lazard by reference to the estimated EBITDA multiples for the CPG comparable companies for calendar year 2016.

Lazard based its sum-of-the-parts discounted cash flow analysis on the estimated respective values of CPG's interest in CPG OpCo, CPG's general partner interest and incentive distribution rights in CPPL and CPG's limited partner units in CPPL.

- With respect to CPG's interest in CPG OpCo, Lazard applied the same 7.5% to 8.0% discount rate range and 11.5x to 13.5x terminal year DCF multiple range described above.

- With respect to CPG's general partner interest and incentive distribution rights in CPPL, Lazard applied discount rates ranging from 14.0% to 15.0%, derived from a number of factors, including, among others, the applicable risk free rate of return and unlevered risk profile of the GP comparable companies. The terminal value was calculated by applying a range of 4.0% to 5.0%, based on estimated distribution yields for the GP comparable companies for calendar year 2016, to estimated terminal year distributions in respect of CPG's general partner interest and incentive distribution rights in CPPL (as reflected in the CPG financial forecasts).

- With respect to CPG's limited partner units in CPPL, Lazard referred to the closing trading price of CPPL common units on the undisturbed date, which was $18.15, and multiplied that value by the number of limited partner units owned by CPG.

Lazard averaged the price per share ranges implied by these calculations and, based on that analysis, reviewed the implied price per share range for shares of CPG common stock, as compared to the per share merger consideration, as set forth below:

| Implied CPG Price Per Share Range – Consolidated | Implied CPG Price Per Share Range – Sum-of-the-Parts | Per Share Merger Consideration |
| --- | --- | --- |
| $20.00 – $25.50 | $19.00 – $24.50 | $25.50 |

86.    The 14A is false and/or misleading due to the omissions identified in ¶ 84 for a variety of reasons.  First, the key input underlying Lazard's DCF analysis is the Company's unlevered free cash flows.  Second, because DCF analyses are extremely sensitive to derivations in the inputs used (particularly those impacting projected cash flows), it is imperative that stockholders be provided with the information underlying the implied perpetuity growth rates selected.  Without the aforementioned omitted information, CPG stockholders cannot evaluate

for themselves whether the analysis was performed properly and, in turn, determine what weight, if any, they should place on the analysis (and Lazard's fairness opinion as a whole) when deciding whether to vote to approve the Proposed Transaction.

**4.      The 14A Fails to Adequately Disclose the Data and Inputs Underlying Goldman's Valuation Exercises.**

87.    The 14A fails to disclose the data and inputs underlying Lazard's valuation exercises that purportedly support their so-called "fairness opinions."

88.    With respect to Goldman's Discounted Cash Flow Analysis, the 14A should disclose: (i) all assumptions (and the quantification and basis for each such) underlying cost of equity; (ii) the definition/formula for distributable cash flow; (iii) the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates; and (iv) the tax rates for all years, not just the terminal period and an explanation of any year-to-year differences.

89.    The omission of this information renders the following statements in the 14A false and/or materially misleading in contravention of the Exchange Act, from page 58 of the 14A:

*Illustrative Discounted Cash Flow Analysis*

Using the CPG financial forecasts, Goldman Sachs performed an illustrative discounted cash flow analysis on CPG. Utilizing illustrative discount rates ranging from 9.3% to 10.7%, reflecting estimates of CPG's cost of equity, Goldman Sachs, using mid-year convention, discounted to present value as of June 30, 2016 (i) estimates of the distributable cash flow for CPG for the six months ending December 31, 2016 and the five years ending December 31, 2021, as reflected in the CPG financial forecasts, and (ii) a range of illustrative terminal values for CPG as of December 31, 2021 which were calculated by applying perpetuity growth rates ranging from 1.00% to 2.00% to a terminal year estimate of the distributable cash flow for CPG, and assuming a terminal cash tax rate of 30.5% as per CPG management. Goldman Sachs then derived ranges of implied equity values of CPG by adding the ranges of present values it derived above, which included the value of an additional tax shield due to extended bonus depreciation and alternative minimum tax credits, as per CPG management, that Goldman Sachs, using mid-year convention, discounted to June 30, 2016 utilizing discount rates ranging from 9.3% to 10.7%, reflecting estimates of CPG's cost of equity. Goldman Sachs then divided the range of implied equity values it derived by the number of fully diluted outstanding shares of CPG common stock, as provided by CPG management, to derive a range of implied equity values per fully diluted outstanding share of CPG common stock of $18.67 to $23.66.

90.    The 14A is false and/or misleading due to the omissions identified in ¶ 88 for a variety of reasons.  First, the key input underlying Goldman's DCF analysis is the Company's

distributable cash flows.  Second, because DCF analyses are extremely sensitive to derivations in the inputs used (particularly those impacting projected cash flows), it is imperative that stockholders be provided with the information underlying the assumed perpetuity growth rates selected.  Without the aforementioned omitted information, CPG stockholders cannot evaluate for themselves whether the analysis was performed properly and, in turn, determine what weight, if any, they should place on the analysis (and Lazard's fairness opinion as a whole) when deciding whether to vote to approve the Proposed Transaction.

91.    With respect to Goldman's Selected Transactions Analysis, the 14A should disclose: (i) the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics; and (ii) an explanation of the apparent discrepancy between the use of EBITDA for the selected companies, whereas adjusted EBITDA was used for CPG.

92.    The omission of this information renders the following statements in the 14A false and/or materially misleading in contravention of the Exchange Act, from page 58 of the 14A:

*Selected Transactions Analysis*

Goldman Sachs analyzed certain information relating to the following selected transactions in the midstream energy industry over the past five years, each of which involved a transaction where the target had a consolidated enterprise value, which we refer to as EV, at the applicable offer price of greater than $5.0 billion:

| Target | Acquirer | Announcement Date |
|---|---|---|
| The Williams Companies, Inc. | Energy Transfer Equity, L.P. | September 2015 |
| MPLX LP | MarkWest Energy Partners, L.P. | July 2015 |
| Atlas Pipeline Partners, L.P. | Targa Resources Partners LP | October 2014 |
| PVR Partners, L.P. | Regency Energy Partners LP | October 2013 |
| El Paso Corporation | Kinder Morgan, Inc. | October 2011 |
| Southern Union Company | Energy Transfer Equity, L.P. | June 2011 |

For each of the selected transactions, Goldman Sachs calculated and compared the consolidated EV of the target at the applicable offer price as a multiple of the target's estimated forward fiscal year earnings before interest, taxes, depreciation and amortization, which we refer to as EBITDA. For purposes of this analysis, forward fiscal year represents the target's next fiscal year following the announcement of the transaction.

While none of the companies that participated in the selected transactions are directly comparable to CPG, the companies that participated in the selected transactions are companies with operations that, for the purposes of analysis, may be considered similar to certain of CPG's results, market size and product profile.

|  | Consolidated EV / Forward EBITDA |
|---|---|
| Selected Transactions | |
| High | 16.8x |
| Median | 12.8x |
| Low | 9.8x |
| Proposed Transaction (1) | 18.2x |

93.     These statements in the 14A are rendered false and/or misleading by the omissions identified in ¶ 91 because, without the objective selection criteria employed by Goldman and the individually observed multiples for the chosen comparable transactions, stockholders are unable to adequately assess whether CPG is being appropriately valued in relation to the precedent transactions selected and reviewed by Goldman.  For example, without this information, stockholders have a limited ability to gauge whether the applied multiples are appropriate given the differences between CPG and the subject transactions.

94.     With respect to Goldman's Selected Companies Analysis, the 14A should explain the omission of any analysis of observed pricing multiples of public companies.  The 14A is rendered false and/or misleading by this omission because such an analysis is a staple in standard fairness opinions.  Thus, this omission is essential to stockholders' ability to properly evaluate the analysis performed by Goldman.  Without the aforementioned information, stockholders' ability to understand Goldman's analysis is significantly limited, rendering them unable to make a fully informed decision whether to vote to approve the Proposed Transaction.

95.     Defendants' failure to provide CPG stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information

in the 14A.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

96.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention. Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein and lack an adequate remedy at law.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and as a class action on behalf of all owners of CPG common stock and their successors in interest, except Defendants and their affiliates (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any Defendant.

98.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of March 15, 2016, CPG had approximately 400 million shares issued and outstanding.

(b)    Upon information and belief, these shares are held by hundreds or thousands of beneficial holders scattered throughout the United States, and are so numerous that it is impracticable to bring them all before this Court.  All members of the Class may be identified from records maintained by CPG or its transfer agent and may be notified of the

pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

(c)     Questions of law and fact are common to the Class, including, inter alia, the following: (i) whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

(d)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

(e)     Plaintiff's claims are typical of those of the other members of the Class.

(f)     Plaintiff has no interests that are adverse to the Class.

(g)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

(h)     Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(i)     Plaintiff anticipates that there will be no difficulty in the management of this litigation, and thus a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

(j)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

99.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other stockholders of CPG, and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

100.     Under Delaware law, where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's stockholders, and if such transaction will result in a change of corporate control, the stockholders are entitled to receive a significant premium. To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's stockholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's stockholders; and/or

(d)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public stockholders.

101.   In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)   participating in any transaction where the Individual Defendants' loyalties are divided;

(b)   participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; and/or

(c)   unjustly enriching themselves at the expense or to the detriment of the public stockholders.

102.   By virtue of their positions as directors and/or officers of CPG, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause CPG to engage in the practices complained of herein.

103.   Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, candor, and independence owed to plaintiff and other public stockholders of CPG.

104.   Because Defendants are knowingly or recklessly breaching their fiduciary duties of loyalty, good faith, and independence in connection with the Proposed Transaction, they bear the burden of proving the entire fairness of the Proposed Transaction.

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Against all Defendants)

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

106.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

107.    During the relevant period, the Individual Defendants disseminated the false and misleading 14A specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

108.    By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the 14A.  The 14A was prepared, reviewed, and/or disseminated by the Individual Defendants.  The 14A misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets.  Defendants were at least negligent in filing the 14A with these

materially false and misleading statements.  Defendants have also failed to correct the 14A, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

109.    The omissions and false and misleading statements in the 14A are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 14A and in other information reasonably available to stockholders.

110.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

111.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

112.    Because of the false and misleading statements in the 14A, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.   Without this information, Plaintiff and CPG stockholders will be prevented from intelligently and rationally deciding for themselves whether they approve of the merger or desire to seek appraisal. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**(Against All Individual Defendants)**

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

114.    The Individual Defendants acted as controlling persons of CPG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of CPG and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14A filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

115.    Each of the Individual Defendants was provided with or had unlimited access to copies of the CPG and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each of the Individual Defendants is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The 14A at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

117.    In addition, as the 14A sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The 14A purports to describe the various issues and information that they reviewed and considered — descriptions that had input from the Individual Defendants.

118.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

119.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' conduct, CPG's stockholders will be irreparably harmed.

120.    Plaintiff and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining Defendants and all those acting in concert with them from consummating the Proposed Transaction unless and until Defendants disclose the material information identified above that has been omitted from the 14A;

C.    Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

D.    Awarding Plaintiff fees and expenses in connection with this litigation, including reasonable attorneys' and experts' fees and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

DATED:  May 2, 2016.

Respectfully submitted,


_____/s/ Thomas E. Bilek_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720
tbilek@bileklaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Shane T. Rowley
**LEVI & KORSINSKY LLP**
30 Broad Street, 24th Floor
New York, NY  10004
Tel: (212) 363-7500
Fax: (212) 363-7171